FILED
United States Court of Appeals
Tenth Circuit

January 21, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

ARSHAD YOUSUF, M.D.,

    Plaintiff,

PHYSICIANS LIABILITY INSURANCE
COMPANY,

    Intervenor-Plaintiff-
    Appellee/Cross-Appellant,

v.

GEORGE COHLMIA, M.D.;
CARDIOVASCULAR SURGICAL
SPECIALISTS CORP.,

    Defendants.
_____

AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY,

    Garnishee-Appellant/
    Cross-Appellee.

Nos. 12-5034, 12-5038

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:09-CV-00545-TCK-TLW)**

Nevin R. Kirkland (David H. Cole with him on the briefs) of Edmonds Cole Law
Firm, PC, Oklahoma City, Oklahoma, for Appellant/Cross-Appellee.

Robert N. Naifeh, Jr. (Sarah Lee Gossett Parrish with him on the briefs) of Derryberry & Naifeh, LLP, Oklahoma City, Oklahoma, for Appellee/Cross-Appellant.

---

Before **TYMKOVICH**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

American National Property and Casualty Company (ANPAC) appeals from the district court's grant of summary judgment in favor of Physicians Liability Insurance Company (PLICO) in a dispute regarding ANPAC's breach of its duty to defend a co-insured. PLICO cross-appeals the district court's denial of its motion for prejudgment interest. We AFFIRM.

# I

In November 2004, Dr. Ashard Yousuf sued Dr. George Cohlmia and Cardiovascular Surgical Specialists Corporation (CVSS) in Oklahoma state court for defamation, tortious interference with business relations/contract, intentional infliction of emotional distress/outrage, negligence, and breach of contract. Dr. Yousuf alleged that Dr. Cohlmia made a series of false statements to local media disparaging Dr. Yousuf's professional reputation. Dr. Cohlmia denied that the statements he made were false.

Dr. Yousuf and Dr. Cohlmia were both board certified surgeons in Tulsa,

Oklahoma, who were granted privileges by Hillcrest Medical Center (HMC) to practice cardio-thoracic surgery. Dr. Yousuf alleged that Dr. Cohlmia wrote a defamatory letter about him to the Board of Directors of the hospital, that the contents of the letter were false or made with reckless disregard of whether or not they were false, and that Dr. Cohlmia intentionally disseminated the contents of the letter to the news media in order to damage Dr. Yousuf's reputation and occupation as a surgeon. He further alleged that even after the HMC Professional Affairs Committee determined that Dr. Cohlmia's allegetions were unfounded, Dr. Cohlmia continued to repeat the defamatory statements to the media with reckless disregard for their truth, and that Dr. Cohlmia's conduct damaged Dr. Yousuf's professional reputation and caused a decline in referrals to him.

CVSS held a professional liability policy with PLICO and two identical general commercial liability policies with ANPAC (one for each business location), each of which covered Dr. Cohlmia as an additional insured. Dr. Cohlmia demanded that both insurers provide for his defense, pursuant to their respective policies. PLICO agreed to defend the lawsuit under a reservation of rights and requested ANPAC to share in the defense. ANPAC refused, contending its policy did not cover the alleged wrongdoing and that it owed no duty to defend. ANPAC further claimed that even if it erred in refusing to defend Dr. Cohlmia, PLICO had no right to indemnification or contribution for the defense costs it incurred.

Before trial, Dr. Yousuf abandoned his claim for defamation and later withdrew his claims for breach of contract and intentional infliction of emotional distress, leaving the jury to consider only his allegations of negligence and intentional interference with business relations. Although Dr. Cohlmia's counsel requested special verdict forms, Dr. Yousuf objected and the court instead provided a general verdict form that did not allow for the jury to allocate the verdict between Dr. Yousuf's two theories of recovery. In February 2006, the jury returned a general verdict against Dr. Cohlmia in the amount of $5,000,000. Despite finding that Dr. Cohlmia acted intentionally and with malice, the jury declined to award punitive damages.

Upon entry of the judgment, Dr. Yousuf commenced a garnishment action against PLICO in state court to collect the judgment against Dr. Cohlmia, and Dr. Cohlmia commenced an action to compel PLICO to pay the judgment rendered against him. The court granted summary judgment to PLICO in both actions, holding that PLICO's policy did not cover the torts inflicted on Dr. Yousuf and that PLICO therefore had no obligation to pay the judgment.[1] PLICO continued to defend the action on appeal, subject to a reservation of rights, and it again demanded that ANPAC share in the defense. It also requested ANPAC to reimburse it for one-half of the defense costs incurred during the trial. ANPAC

---

[1] It is undisputed that PLICO's policy excluded coverage for an insured's intentional conduct.

again refused.

The matter now before us stems from the subsequent garnishment action brought in state court by Dr. Yousuf against ANPAC, contending that his judgment against Dr. Cohlmia was covered by ANPAC's policy because it covered intentional acts. ANPAC removed the action to federal district court. PLICO thereafter filed a motion to intervene, which was granted by the district court. Seeking to recover its defense costs from ANPAC, PLICO asked the district court to find, as a matter of law, that ANPAC's policies provide coverage for the underlying judgment against Dr. Cohlmia. ANPAC, for its part, maintained that the damages awarded to Dr. Yousuf were not covered by its policy and that it had no duty to defend Dr. Cohlmia in the underlying action.

Both parties moved for summary judgment. In the meantime, Dr. Cohlmia's appeal from the underlying jury verdict was consolidated in the Oklahoma Court of Civil Appeals with his appeal from the determination that PLICO was not obligated to pay the judgment against him, as well as Dr. Yousuf's related appeal. After briefs were submitted in the present action, the Oklahoma Court of Civil Appeals reversed the underlying state court judgment due to an erroneous jury instruction on intentional interference with business relations, and remanded the matter for a new trial. In the consolidated appeals, it vacated the determinations that PLICO's policy did not cover Dr. Cohlmia's torts against Dr. Yousuf. The Oklahoma Supreme Court denied

-5-

certiorari review. The district court in this case then correctly determined that it could no longer decide Dr. Yousuf's garnishment claim against ANPAC, which hinged on the now-vacated judgment against Dr. Cohlmia, but that it could still decide whether ANPAC had breached its duty to defend Dr. Cohlmia and whether PLICO could recover from ANPAC all or a portion of the costs it had already incurred in Dr. Cohlmia's defense.

The district court granted summary judgment in favor of PLICO, concluding that under Oklahoma law ANPAC had a duty to defend Dr. Cohlmia in the underlying action and that ANPAC was liable for fifty percent of PLICO's costs of defending Dr. Cohlmia thus far, under a theory of subrogation. The court held that while PLICO's policy provided coverage for negligence but not for intentional torts, it nevertheless specifically committed PLICO *to defend* "any claim for damages if said damages are in consequence of the performance of a criminal act or willful tort or sexual act," Aplt. App., vol. II at 328, even though any losses from such conduct would not be indemnified under the policy. With respect to ANPAC's policy, the district court held that it provided primary coverage for intentional torts, including intentional interference with business relations, but that it provided only excess coverage for negligence. It further held that both insurers had an equal duty to defend Dr. Cohlmia against Dr. Yousuf's allegations.

Regarding whether ANPAC could be held liable to reimburse PLICO for its

share of Dr. Cohlmia's defense costs, the district court concluded that the doctrines of both contractual and equitable subrogation support PLICO's claim. The court determined that because PLICO's claim "rests primarily on contractual subrogation," Oklahoma's five-year statute of limitations for written contracts applied, rather than the three-year statute of limitations for equitable subrogation. *Yousuf v. Cohlmia*, 718 F. Supp. 2d 1279, 1298 (N.D. Okla. 2010). Since both insurers had a duty to defend Dr. Cohlmia and the jury did not indicate the basis of the verdict, the court concluded that defense costs should be evenly divided between the insurers.

Once summary judgment for PLICO was granted, PLICO and ANPAC negotiated an agreement regarding the costs and fees PLICO had incurred defending Dr. Cohlmia, stipulating that ANPAC's portion was $206,698.78. This amount represents one-half of the total attorney fees and costs, less an agreed five-percent reduction. PLICO then moved for prejudgment interest in the amount of $149,110.57, contending that the district court was required to include prejudgment interest of fifteen percent per year from the date of the judgment pursuant to title 36, section 3629(B) of the Oklahoma Statutes. ANPAC opposed the motion and the matter was submitted to a magistrate judge for a report and recommendation. The magistrate judge recommended prejudgment interest be denied on two grounds. First, he considered himself bound by *Regional Air, Inc. v. Canal Insurance Co.*, 639 F.3d 1229 (10th Cir. 2011), in which we held that

prejudgment interest under section 3629 applies only to "verdicts" rendered by juries, not to summary judgments entered by the court. Second, he concluded that the attorney's fees at issue were not liquidated, certain, or reasonably ascertainable, precluding prejudgment interest under Oklahoma law. The district court affirmed, denying PLICO's motion for prejudgment interest.

On appeal, ANPAC asserts that it had no duty to defend Dr. Cohlmia because the district court erred in concluding ANPAC's policy covers the claims alleged by Dr. Yousuf in the underlying action. ANPAC also contends that an equitable subrogation claim is untimely and, in any event, PLICO's contractual subrogation claim for defense costs cannot succeed because the duty to defend an insured is individual to each insurer under Oklahoma law. PLICO cross-appeals the district court's denial of prejudgment interest, arguing that we should overturn *Regional Air* based on an earlier decision by the Oklahoma Supreme Court, *Dulan v. Johnston*, 687 P.2d 1045 (Okla. 1984), and that the costs and fees it incurred defending Dr. Cohlmia are liquidated.

**II**

We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party. *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007). Summary judgment is warranted only if "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We review the district court's decision on prejudgment interest for abuse of discretion. *Driver Music Co. v. Commercial Union Ins. Cos.*, 94 F.3d 1428, 1433 (10th Cir. 1996). "However, any statutory interpretation or legal analysis underlying such an award is reviewed de novo." *Id.* We apply substantive Oklahoma law in this diversity action.

## A. ANPAC's Duty to Defend

The duty of an insurer to defend its insured under Oklahoma law "is separate from, and broader than, the duty to indemnify . . . ." *First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.*, 928 P.2d 298, 303 (Okla. 1996). "An insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to *the potential of liability* under the policy." *Id.* (emphasis in original). Thus, in order to determine whether ANPAC had a duty to defend Dr. Cohlmia, we must ascertain whether the conduct alleged in the underlying suit gave rise to the potential of liability under ANPAC's policies covering Dr. Cohlmia.

The Oklahoma Supreme Court has held that "the duty of an excess insurer to participate in the insured's defense is triggered only by exhaustion of the primary policy." *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 832-33 (Okla. 2001). ANPAC's policies covering Dr. Cohlmia provide: "If there is other insurance covering the same loss or damage, we will pay only

-9-

for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not." Aplt. App., vol. II at 429. PLICO's policy, on the other hand, contains a "pro rata" clause regarding other insurance coverage. *Id.* at 331. We therefore agree with the district court that "ANPAC is an excess insurer with regard to [Dr. Yousuf's] claim for negligence," and that ANPAC's duty to defend based on the negligence claim was not triggered because PLICO did not exhaust its policy limits. *Yousuf*, 718 F. Supp. 2d at 1297-98.

But PLICO contends the claim for intentional interference with business relations is another matter. It is undisputed that PLICO's policy does not cover any intentional conduct, including knowingly engaging in intentional interference with business relations. Therefore, if ANPAC's policy does cover the intentional misconduct alleged by Dr. Yousuf, ANPAC would become the primary insurer with respect to that claim and would have had an equal duty to defend Dr. Cohlmia in the state court action.

Under Oklahoma law, the interpretation of insurance contracts is "a matter of law for the Court to determine . . . ." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991). Terms in the policy that are "unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intention of the parties as it existed at the time the contract was negotiated." *Id.* On the other hand, if the meaning of a term is

-10-

ambiguous or in conflict with other provisions, the policy will be interpreted

"most favorably to the insured and against the insurance carrier." *Id.* at 377; *see*

*also Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 868 (Okla. 2003) ("[I]nsurance

contracts are contracts of adhesion because of the uneven bargaining position of

the parties. Consequently, in the event of ambiguity or conflict in the policy

provisions, a policy of insurance is to be construed strictly against the insurer and

in favor of the insured." (internal citations, quotations, and alterations omitted)).

ANPAC's two identical policies covering Dr. Cohlmia state that ANPAC

"will pay on behalf of the insured all sums which the insured shall become legally

obligated to pay as damages because of bodily injury, property damage, or

personal injury caused by an occurrence to which this insurance applies." Aplt.

App., vol. II at 418 (emphasis omitted). The term "occurrence" is defined in the

policies as "an accident, including continuous or repeated exposure to conditions

which results in bodily injury or property damage neither expected nor intended

from the standpoint of the insured and with respect to personal injury, the

commission of an offense, or a series of similar or related offenses." *Id.* at 426

(emphasis omitted). "Personal injury" is defined to mean:

> injury which arises out of one or more of the following offenses
> committed in the conduct of the named insured's business:
>   a. false arrest, detention or imprisonment, or malicious
>      prosecution;
>   b. *the publication or utterance of* a libel or slander or of other
>      defamatory or *disparaging material*, or a publication or
>      utterance in violation of an individual's right of privacy . . . .

-11-

*Id.* at 426-27 (emphasis added). In the underlying suit, the damages that Dr. Yousuf alleged he suffered fall into this definition of "personal injury" because they arose from the publication or utterance of disparaging material.

As the district court noted, the tort of interference with business relations is also sometimes called disparagement. *Yousuf*, 718 F. Supp. 2d at 1286. We held in *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974 (10th Cir. 1995), under Kansas law, that policy language virtually identical to the provision at issue here provided coverage for the tort of interference with business relations. *Id.* ("[W]e conclude that [the policy term covering 'the offense' of] 'the publication of . . . other defamatory or disparaging material' is susceptible of a construction supporting coverage of the [Plaintiff's] claim that [Defendant] interfered with their contractual and business relations . . . ."); *see also McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. 1999) (holding that commercial general liability policy providing coverage for "personal injury" stemming from "disparagement" includes claim for tortious interference with contractual relationships); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) ("A business disparagement claim is similar in many respects to a defamation action. The two torts differ in that defamation actions chiefly serve to protect the personal reputation of the injured party, while

a business disparagement claim protects economic interests."[2] (internal citation omitted)).

We similarly conclude that the provision in ANPAC's policy providing coverage for "personal injury" resulting from "the publication or utterances of a libel or slander or of other defamatory or disparaging material" is broad enough to encompass the tort of intentional interference with business relations. ANPAC has provided no authority to convince us that Oklahoma courts would hold otherwise.

B. *Public Policy Concerns*

ANPAC contends that such an interpretation is against public policy because it extends coverage to include intentional wrongdoing. We are not convinced. First, we note that ANPAC's policies covering Dr. Cohlmia specifically provide coverage, in no uncertain terms, for injuries arising from conduct that constitutes several intentional torts. As discussed above, while ANPAC's policies preclude coverage for intentional conduct resulting in bodily injury or property damage, they do not exclude intentional wrongdoing that

---

[2] In Oklahoma, in order to prove tortious interference with a business or contractual relationship, a plaintiff must show: "(1) he or she had a business or contractual right that was interfered with; (2) the interference was malicious and wrongful and was not justified, privileged, or excused; and (3) damage was proximately sustained as a result of the interference." *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1285 (10th Cir. 2012) (citing *Mac Adjustment, Inc. v. Prop. Loss Research Bureau*, 595 P.2d 427, 427 (Okla. 1979)); *see also Wilspec Techs., Inc. v. Dunan Holding Grp. Co.*, 204 P.3d 69, 74 (Okla. 2009).

results in "personal injury." *See* Aplt. App., vol. II at 426.

The policies define an "occurrence" in the context of bodily injury or property damage as "an accident" that is "neither expected nor intended from the standpoint of the insured." *Id.* (emphasis omitted). The term "occurrence" for purposes of personal injury, on the other hand, is defined as "the commission of an offense." *Id.* "Personal injury" is then defined to specifically include injury resulting from a number of "offenses" that can be intentional torts, including "false arrest, detention or imprisonment, or malicious prosecution . . . the publication or utterances of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy," as well as "wrongful entry or eviction, or other invasion of the right of private occupancy." *Id.* at 426-27. Under Oklahoma law, "[p]arties to [an] insurance contract are at liberty to contract for insurance to cover such risks as they see fit and are bound by terms of contract and courts will not undertake to rewrite the terms thereof." *Dodson*, 812 P.2d at 376 (quoting *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (Okla. 1974)). We accordingly are required to "give a reasonable effect to all of [an insurance contract's] provisions, if possible." *Id.*

ANPAC cites two insurance treatises as well as several cases from various states for the proposition that it is against public policy to extend insurance coverage to intentional wrongdoing. *See, e.g.*, 1 ALLAN D. WINDT, INSURANCE

-14-

CLAIMS AND DISPUTES § 6:19 (5th ed. 2012) ("There are cases from numerous states broadly stating that coverage for intentional wrongdoing is against public policy."); 6 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 101:22 (3d ed. 2012) [hereinafter COUCH] ("In general, it is against public policy for an insurance contract to provide coverage for the intentional or willful misconduct of an insured."); *Gearing v. Nationwide Ins. Co.*, 665 N.E.2d 1115, 1118 (Ohio 1996) ("[P]ublic policy generally prohibits obtaining insurance to cover damages caused by intentional torts.").

These authorities are distinguishable for several reasons. First, they address the public policy concerns regarding an insurer *indemnifying* an insured for intentional tortious conduct; they do not stand for the proposition that it is against public policy for an insurer *to defend* an insured against allegations of intentional acts when its policy specifically provides coverage. In contrast to a general rule condemning indemnification for intentional wrongdoing, the case law addressing an insurer's duty to defend makes clear that it is not against public policy to defend an insured against claims for intentional or reckless conduct. *See Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 171-72 (N.Y. 2002) (insurer had duty to defend defamation claim despite public policy against insuring intentional wrongdoing); *Burnham Shoes, Inc. v. W. Am. Ins. Co.*, 504 So.2d 238, 241 (Ala. 1987) (no violation of public policy for insurer to defend claims of intentional misconduct even where indemnification of such

conduct would be prohibited as contrary to public policy), *abrogated on different grounds by Williamson v. Indianapolis Life Ins. Co.*, 741 So.2d 1057 (Ala. 1999). Therefore, even if indemnity coverage for intentional wrongdoing is prohibited by public policy, ANPAC still breached its duty to defend Dr. Cohlmia in the underlying action.

ANPAC also cites *Pendergraft v. Commercial Standard Fire & Marine Co.*, 342 F.2d 427 (10th Cir. 1965) (interpreting Oklahoma law), and *Penley v. Gulf Insurance Co.*, 414 P.2d 305 (Okla. 1966), asserting these cases demonstrate that Oklahoma prohibits providing coverage for intentional wrongdoing. Neither case supports ANPAC's argument. *Pendergraft* concerned "bodily injury" coverage under a homeowner's liability policy, and, as here, the policy specifically excluded coverage for damages caused intentionally. Moreover, the insured's conduct there involved a criminal assault. *See* 342 F.2d at 428. The court in *Penley* construed "property damage" in an automobile liability policy which only covered damages "caused by accident." *See* 414 P.2d at 307. Neither *Pendergraft* nor *Penley*, nor any other case we have found applying Oklahoma law, actually prohibited insurance coverage of intentional wrongdoing as against public policy.

Moreover, exceptions to the general rule exist even in jurisdictions that generally prohibit coverage of intentional wrongdoing as against public policy. As explained in one of the insurance treatises cited by ANPAC:

-16-

> Even though it may be against public policy to insure for an insured's intentional or willful conduct, some jurisdictions may find coverage for the conduct when the policy language specifically provides coverage for that conduct; a statute allows insurance for intentional conduct; or the court finds that the public interest in having victims compensated for their injuries, outweighs public interest in forcing the willful wrongdoer to pay the consequences of the misconduct.

COUCH § 101:24 (footnotes omitted); *see, e.g.*, *New Madrid Cnty. Reorganized Sch. Dist. No. 1 v. Cont'l Cas. Co.*, 904 F.2d 1236, 1242-43 (8th Cir. 1990) (rejecting argument that Missouri's public policy prohibits coverage of intentional wrongdoing where policy did not contain intentional-acts exclusion); *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 163-65 (E.D. Va. 1993) (rejecting argument that public policy barred recovery where policy contained no intentional-acts exclusion, and finding policy coverage).

Even assuming Oklahoma would generally prohibit indemnity coverage for intentional wrongdoing, the instant matter presents a strong case for allowing an exception to that general rule. ANPAC's policies covering Dr. Cohlmia specifically provide indemnification for certain intentional misconduct, and there is no evidence that the availability of insurance coverage induced Dr. Cohlmia to engage in intentional misconduct. Furthermore, the interest in compensating an innocent third party, Dr. Yousuf, outweighs the concern that Dr. Cohlmia would unjustly benefit from this coverage. As explained by the Iowa Supreme Court in *Grinnell Mutual Reinsurance Co. v. Jungling*, "the ultimate and primary

-17-

beneficiaries of [allowing] coverage [for intentional wrongdoing] will be innocent third parties," and the insurer is "in a far better position than anyone to protect itself by including an intentional-acts-exclusion provision" in the policy. 654 N.W.2d 530, 541 (Iowa 2002); *see also N. Bank v. Cincinnati Ins. Co.*, 125 F.3d 983, 986-87 (6th Cir. 1997) (where an umbrella insurance policy included coverage of intentional torts in definition of "personal injury" but excluded coverage for intentional torts in definition of "occurrences," court held policy provided coverage under Michigan law because of the ambiguity and despite public policy concerns); *W. Protectors Ins. Co. v. Shaffer*, 624 F. Supp. 2d 1292, 1301 (W.D. Wash. 2009) (upholding coverage, under Washington law, where homeowner's policies specifically provided coverage for invasion of privacy (which state recognized as intentional tort) despite intentional-act exclusion).

Accordingly, we agree with the district court that public policy does not excuse ANPAC's breach of its duty to defend Dr. Cohlmia.

*C.  Policy Exclusions*

ANPAC further contends it did not have a duty to defend Dr. Cohlmia because coverage for the tortious acts alleged by Dr. Yousuf was specifically excluded by the terms of its policies. The relevant "Business Liability Exclusions" provided that the policies do not apply:

> 17. to personal injury arising out of the willful violation of a penal statute or ordinance committed by or with knowledge or consent of any insured.

18. to personal injury arising out of any publication or utterance described in item b. of the Definition of personal injury . . .
  b.  concerning any organization or business enterprise or its products or services made by or at the direction of any insured with knowledge of the falsity thereof.

Aplt. App., vol. II at 422 (emphasis omitted).

We first address exclusion 17.  ANPAC concedes that Dr. Cohlmia has not been charged criminally based on the alleged wrongdoing in this case, but insists that no criminal prosecution is necessary so long as the underlying actions from which the injury arose constitute the willful violation of a penal statute.  In support of this proposition, ANPAC cites *National Fire Insurance Co. of Hartford v. NWM-Oklahoma, LLC, Inc.*, 546 F. Supp. 2d 1238 (W.D. Okla. 2008).  In that case, the court held that a civil action based in part on the violation of a federal criminal statute, 18 U.S.C. § 2510 *et seq.* (the federal wiretap act), was excluded from coverage as a willful violation of a penal statute, despite the fact that no criminal charges had been brought.  *Id.* at 1248-49.  In reaching this conclusion, the court noted that numerous other courts hearing civil claims based on violations of the federal wiretap act and similar state wiretap statutes had determined that such claims fall within policy exclusions for willful violation of a penal statute whether or not criminal prosecution had been pursued.  *Id.*  Here, however, no claim was alleged based on the violation of a criminal statute that also provides civil remedies.

Moreover, as the district court observed, in contrast to the claims in

-19-

*National Fire*, the allegations of negligence and intentional interference with business relations in this case do not "arise from acts that necessarily establish a willful violation of the penal statutes for libel and slander."[3]  *Yousuf*, 718 F. Supp. 2d at 1292.  Furthermore, in examining the policies' language, which explicitly provides coverage for personal injury for "the publication or utterance of a *libel or slander. . .*," it would be "inconsistent" and would "render[] the coverage provisions illusory" to then exclude coverage based on the willful violation of Oklahoma's libel or slander penal statutes.  *See Yousuf*, 718 F. Supp. 2d at 1291. We therefore decline to extend exclusion 17 to this context.

The argument that exclusion 18 precludes coverage of Dr. Yousuf's claims is unavailing simply because Dr. Yousuf is not an "organization or business enterprise" as required by the plain language of the exclusion.  ANPAC never contends that Dr. Yousuf is anything but a person, nor does it cite any authority to support the contention that because Dr. Yousuf brought a claim for intentional interference with business relations he must be considered a business enterprise. In Oklahoma, the tort of intentional interference with business or contractual relations does not require either party to be a business enterprise.  *See, e.g.,*

---

[3] To state a claim for tortious interference with a business relationship, a plaintiff must show that "*the interference* was malicious," among other things. *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 654 (Okla. 1990) (emphasis added).  But "malice" is defined as "an unreasonable and wrongful act done intentionally, without just cause or excuse." *Id.*  This element is not the same as showing that the defendant willfully violated a penal statute.

*Cohlmia*, 693 F.3d at 1285-86 (noting Dr. Cohlmia's claim for tortious interference with his contracts with patients and Blue Cross/Blue Shield survived motion to dismiss, *id.* at 1276, and affirming grant of summary judgment based on lack of evidence of damage proximately caused by loss of Dr. Cohlmia's privileges at one of four hospitals) (interpreting Oklahoma law); *Niemeyer v. U.S. Fid. & Guar. Co.*, 789 P.2d 1318, 1320-21 (Okla. 1990) (holding action for tortious interference of contract between individual person and a business sufficiently pled).

Even assuming the policy language is ambiguous, under Oklahoma's reasonable expectations doctrine "the meaning of the language is not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean." *Spears*, 73 P.3d at 868. Although the policy does not define "organization" or "business enterprise," it clearly distinguishes between a person and an organization three times in the "Business Liability Exclusions" section alone. *See* Aplt. App., vol. II at 420-422 (exclusion 8 precludes coverage for "bodily injury or property damage for which the insured or their indemnitee may be held liable: a. as *a person or organization* engaged in the business of manufacturing . . ."; exclusion 15 excludes from exclusion the "loss of use from other tangible property resulting from . . . physical injury to or destruction of the named insureds products or work performed by . . . the named insured after such products or work have been put to use by *any person or*

-21-

*organization* other than an insured"; exclusion 11 distinguishes between a "partnership or joint venture" and "any partner or member thereof" (emphasis added)). Moreover, an "organization" ordinarily means "a *group of persons* organized for some end or work," *Random House Unabridged Dictionary* 648 (2d ed. 1993) (emphasis added); an "enterprise" is "a company organized for commercial purposes; business firm," *id.* at 1364.

Under Oklahoma law, "ambiguities are construed most strongly against the insurer; and . . . in cases of doubt, words of inclusion are liberally applied in favor of the insured and words of exclusion are strictly construed against the insurer." *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 865 (Okla. 1996). Exclusion 18 must be construed in favor of the insured and thus does not preclude coverage of Dr. Yousuf as an individual medical professional.

Alternatively, exclusion 18 precludes personal injuries arising out of a publication or utterance "made by or at the direction of any insured with knowledge of the falsity thereof." ANPAC asserts that its insured, Dr. Cohlmia, knew his statements were false when he made them. Aplt. Br. at 21. But ANPAC's focus on the jury's findings (and its implicit finding of knowledge of falsity) is misplaced. An "insurer's defense duty is determined *on the basis of information* gleaned *from the petition (and other pleadings)*, *from the insured* and *from other sources available to the insurer* at the time the defense is demanded

-22-

(or tendered) rather than by the outcome of the third-party action."[4] *First Bank of Turley*, 928 P.2d at 303-04 (emphasis in original). "The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible." *Id.* at 303 n.15 (emphasis omitted) ("The duty to defend cannot be limited by the precise language of the pleadings."). The amended petition alleged:

> 6. The contents of the . . . letter were false when they were made and Cohlmia . . . knew they were false at the time he wrote the letter and disseminated the same to . . . the news media, *with reckless disregard of whether the statements made were false or not*.
>
> 7. Cohlmia/CVSS intentionally and negligently disseminated the . . . letter to news outlets . . . when he knew the statements contained in the . . . letter were false *and/or with reckless disregard of whether they were false or not. . . .*
>
> 13. Cohlmia/CVSS made these statements and published them with the knowledge they were false and/*or with reckless disregard of whether they were false or not*.

Aplt. App., vol. II at 370-71. The inclusion of the possibility that the statements were made with reckless disregard of the truth and the insured's own denial of the statements' falsity are sufficient to avoid exclusion 18 and trigger potential liability under the ANPAC policies.

In sum, given the allegations of Dr. Yousuf and the language of the ANPAC policies, Dr. Cohlmia had a right to expect ANPAC to defend him. ANPAC does not dispute that Dr. Cohlmia and PLICO notified it of the suit and

---

[4] Moreover, the judgment in Dr. Yousuf's action against Dr. Cohlmia was reversed on appeal and remanded for a new trial, Aplt. App., vol. III at 689, voiding the jury's findings.

-23-

set forth plausible arguments that Dr. Yousuf's allegations, if proven, could give rise to damages covered by the ANPAC policies. ANPAC's counsel admitted as much in a May 14, 2007 letter to PLICO's counsel, which stated that the claims against Dr. Cohlmia "could conceivably fall under the terms of the business liability coverage as discussed in *Bankwest*," but went on to argue that coverage was actually excluded for a variety of reasons. Aplt. App., vol. II at 317. We agree with the district court that there is no genuine issue of material fact regarding ANPAC'S breach of its duty to defend. Under Oklahoma law,

> [a]n insurer who disputes the insured's demand to defend has three options. It can (1) seek declaratory relief that would define the insurer's rights and obligations; (2) defend the insured under a reservation of rights, or (3) refuse to take any action at the peril of being later found in breach of its duty to defend.

*First Bank of Turley*, 928 P.2d at 304-05 (footnote omitted). ANPAC chose to pursue the third option at its peril.

*D. ANPAC's Liability to PLICO*

Having established that ANPAC breached its duty to defend Dr. Cohlmia, we turn to the question of whether PLICO can compel ANPAC to reimburse some or all of the costs it incurred during its initial defense of Dr. Cohlmia. The district court held that by defending Dr. Cohlmia under a reservation of rights, PLICO's policy enabled it to step into the shoes of its insured to recover one-half of its defense costs under a theory of subrogation. *See Jorksi Mill & Elevator Co. v. Farmers Elevator Mut. Ins. Co.*, 404 F.2d 143, 147 (10th Cir. 1968)

-24-

("Subrogation is the substitution of one person in the place of another with reference to a lawful claim, demand or right."). We agree.

The district court determined that "[t]he doctrines of contractual and equitable subrogation support PLICO's claim for reimbursement." *Yousuf*, 718 F. Supp. 2d at 1296. The Oklahoma Supreme Court explained the difference between these two doctrines in *Brown v. Patel*, 157 P.3d 117 (Okla. 2007):

> Conventional (or contractual) subrogation is created by an agreement or contract between parties granting the right to pursue reimbursement from a third party in exchange for payment of a loss. Equitable subrogation allows a party who has paid to stand in the shoes of the party to whom the amount was owed and proceed against the third party primarily responsible for the amount paid. In both circumstances the subrogation is based upon payment.

*Id.* at 125 (citations omitted); *see also U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla. 2001) ("Equitable subrogation . . . arises by implication in equity to prevent an injustice. The . . . doctrine is based on the relationship of the parties and equitable principles of establishing substantial justice, and it is broad enough to include every instance where one person who is not a mere volunteer, pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter.").

Although the facts of this case would arguably support recovery under both contractual and equitable subrogation, an equitable subrogation claim is subject to a three-year statute of limitations under Oklahoma law and thus is time-barred. *See Republican Underwriters Ins. Co. v. Fire Ins. Exch.*, 655 P.2d 544, 546 (Okla.

1982) (three-year statute of limitations for unwritten, implied-in-law contracts applies to claims of equitable subrogation). A contractual subrogation claim, however, is governed by Oklahoma's five-year statute of limitations for written contracts and is not untimely.[5] *See Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252, 253, 255 (10th Cir. 1981) (applying Oklahoma's five-year statute of limitations where insured brought suit against insurer alleging breach of contract for failure to defend); *see also id.* at 255-56 ("[T]he insurer's continued refusal to defend the insureds constituted a series of breaches of its contractual obligations. As the limitations period runs with each breach, the insureds are only precluded from recovering those litigation expenses incurred prior to limitations period, here, five years.").

With respect to contractual subrogation, the clause in PLICO's policy covering Dr. Cohlmia provided, in relevant part: "In the event of any payment under this policy, the company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization . . . ." Aplt. App., vol. II at 332. PLICO paid for the costs of defending Dr. Cohlmia and thereby gained Dr. Cohlmia's cause of action against ANPAC for breach of its duty to defend him.

---

[5] Assuming PLICO's cause of action accrued when ANPAC rejected PLICO's demands to share in the costs of defense on June 29, 2005, PLICO filed its Complaint in Intervention on October 15, 2009, well within the five-year statute of limitations for contractual subrogation.

The district court reasoned that PLICO could only be reimbursed for one-half of its defense costs rather than the full amount because its policy obligated PLICO to defend both negligent and willful torts committed by its insured, even though its policy only provided indemnity for non-intentional acts. The court determined that "both PLICO and ANPAC were obligated to defend the negligence as well as the intentional interference with business relationship claims" and, accordingly, concluded that ANPAC and PLICO should each bear one-half of the costs of Dr. Cohlmia's defense. *Yousuf*, 718 F. Supp. 2d at 1295-96, 1298.

ANPAC argues that *United States Fidelity & Guaranty Co. v. Tri-State Insurance Co.*, 285 F.2d 579 (10th Cir. 1960), dictates a contrary result. In *Tri-State*, we held under Oklahoma law that as between two primary insurers, each with an equal duty to defend a claim against their common insured, "[t]he duty to defend is personal to each insurer" and a "carrier is not entitled to divide the duty nor require contribution from another absent a specific contractual right." *Id.* at 582. ANPAC's reliance on *Tri-State* is misplaced because the plaintiff insurance company in that case did not assert a contractual subrogation claim but was instead seeking equitable contribution, a remedy not sought by PLICO in this case. *See id.* ("[N]o contractual relationship existed between Tri-State and U.S.F. & G. *and the latter does not claim by subrogation.*" (emphasis added)). Accordingly, *Tri-State* does not control our decision here.

PLICO's policy covering Dr. Cohlmia clearly gives it a right of contractual subrogation. ANPAC has provided no Oklahoma case suggesting that right does not extend to defense costs. We therefore affirm the district court's grant of summary judgment requiring ANPAC to reimburse PLICO for one-half of its defense costs.

**III**

PLICO has cross-appealed, contending the district court erred by failing to award prejudgment interest on the defense costs ANPAC was ordered to reimburse. We review the district court's decision for abuse of discretion but consider any legal question de novo. *Driver Music Co.*, 94 F.3d at 1433. In a diversity case, "[t]he issue of possible entitlement to prejudgment interest is governed by state law." *McNickle v. Bankers Life & Cas. Co.*, 888 F.2d 678, 680 (10th Cir. 1989).

Our analysis of whether prejudgment interest is warranted in this case begins with title 36, section 3629(B) of the Oklahoma Statutes, which provides in part: "If the insured is the prevailing party, the court in rendering judgment shall add interest on the verdict at the rate of fifteen percent (15%) per year from the date the loss was payable pursuant to the provisions of the contract to the date of the verdict." § 3629(B). PLICO claims that because reimbursement was ordered under a theory of subrogation, it has effectively stepped into Dr. Cohlmia's shoes

as an insured prevailing party and is entitled to prejudgment interest pursuant to this statute. ANPAC maintains the district court was correct in concluding that prejudgment interest is barred in this instance under our decision in *Regional Air* because PLICO prevailed on a summary judgment rather than a jury verdict, and also because prejudgment interest is unavailable in Oklahoma where the damages are not certain, liquidated, or reasonably ascertainable.

In *Regional Air*, applying Oklahoma law, we held that prejudgment interest pursuant to section 3629(B) is only awardable on a "verdict"—the decision of a jury—and is not available for the broader category of a "judgment," which encompasses "all final determinations of rights, however obtained." 639 F.3d at 1237-38. PLICO acknowledges that because there was no jury verdict in this case, its claim for prejudgment interest must fail if *Regional Air* controls. But it contends that in *Regional Air* we overlooked a controlling Oklahoma case, *Dulan v. Johnston*, 687 P.2d 1045 (Okla. 1984).

In *Dulan*, the Oklahoma Supreme Court considered title 12, section 727 of the Oklahoma Statutes, a statute that governed prejudgment interest until 2005 and provided in relevant part:

> *All judgments* of courts of record except the Worker's
> Compensation Court shall bear interest at the rate of fifteen
> percent (15%) per year, . . . from the date of rendition, provided
> that:
> 2. When a verdict for damages by reason of personal injuries is
> accepted by the trial court, the court shall add interest on said
> verdict at the rate of fifteen percent (15%) per year from the date

the suit was commenced to date of verdict . . . .

*Dulan*, 687 P.2d at 1047 (emphasis and omission in original) (quoting OKLA. STAT. ANN. tit. 12, § 727). There, the trial court awarded prejudgment interest on a confession of judgment. The defendant appealed, contending that no prejudgment interest was warranted because without a jury trial no "verdict" had been entered in the case. *Id.* The Oklahoma Supreme Court affirmed the trial court's award of prejudgment interest, stating that the defendant's argument was "wholly without merit" because "there is clearly no difference in legal effect between a judgment entered by confession and a judgment entered on a verdict after a trial by a jury." *Id.*

*Dulan* can thus be fairly characterized as holding that, under Oklahoma law, a statute providing for prejudgment interest for a prevailing party on a "verdict" is not limited to verdicts reached after a jury trial but applies equally to judgments entered pursuant to a confession of judgment, a stipulation, a summary judgment, or any other final determination of rights. Because the task of a federal court sitting in diversity is "not to reach our own judgment regarding the substance of the common law, but simply to ascertain and apply the state law . . . we must defer to the most recent decisions of the state's highest court." *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (internal quotation marks, citations, and alterations omitted). The relevant language of the statute in *Dulan* is essentially identical to the statute at issue in the case before us, § 3629(B).

It is apparent from our decision in *Regional Air* that the parties did not cite *Dulan* to us. While this panel may not overrule a prior panel of this court, we "may overrule a point of law established by a prior panel after obtaining authorization from all active judges on the court." *United States v. Meyers*, 200 F.3d 715, 721 (10th Cir. 2000). Having done so,[6] we overrule *Regional Air* on its interpretation of the Oklahoma statute providing for prejudgment interest. We hold that PLICO's claim for prejudgment interest is not defeated simply because the judgment was entered pursuant to summary judgment rather than a jury verdict.

Nevertheless, under title 23, section 6 of the Oklahoma Statutes a prevailing party is not entitled to prejudgment interest "unless the amount of recovery is liquidated or capable of ascertainment by calculation or resort to well-established market values." *Withrow v. Red Eagle Oil Co.*, 755 P.2d 622, 625 (Okla. 1988); *see also Taylor v. State Farm Fire & Cas. Co.*, 981 P.2d 1253, 1260-61 (Okla. 1999) (prejudgment interest under section 3629 is collectable only when authorized pursuant to title 23, section 6 of the Oklahoma Statutes). We will reverse a district court's finding that damages were not certain only if clearly

---

[6] This opinion has been circulated to the *en banc* court whose members have unanimously agreed to our specific overruling of *Regional Air* to the extent it holds, contrary to controlling Oklahoma case law as set forth *supra*, that prejudgment interest may only be afforded under title 36, section 3629(B) of the Oklahoma Statutes if the judgment was entered pursuant to a jury verdict awarded to prevailing parties.

erroneous. *Transpower Constructors v. Grand River Dam Auth.*, 905 F.2d 1413, 1422 (10th Cir. 1990).

Under Oklahoma law, a dispute over whether a party is entitled to recover an amount that is calculable based on undisputed evidence does not render the amount uncertain or unascertainable. *See Stickney v. Kan. City Life Ins. Co.*, 149 P.3d 1048, 1054-55 (Okla. Civ. App. 2006). Instead, the question here is whether the defense costs awarded to PLICO, which consist entirely of attorney fees, were certain and ascertainable.

We addressed a similar question in *United States v. Hardage*, 985 F.2d 1427 (10th Cir. 1993). In *Hardage*, the district court had included prejudgment interest on an award of joint defense attorney fees that were recoverable pursuant to an indemnity agreement. *Id.* at 1436. Because Oklahoma requires a court to conduct an inquiry into the reasonableness of legal expenses before they can be awarded, we held that such expenses are not liquidated and prejudgment interest is therefore not awardable on such damages. *Id.* at 1437-38.

The Oklahoma Supreme Court cited *Hardage* for this proposition and applied the same principle in *Pierce Couch Hendrickson Baysinger & Green v. Freede*, 936 P.2d 906 (Okla. 1997), a dispute between a law firm and a client over unpaid legal fees. *Id.* at 907. In that case, the court held that "[l]ike the attorney fees in *Hardage*, the expenses in the present case were subject to the fact-finders [sic] determination of reasonableness. Thus, they were not liquidated and not

-32-

subject to prejudgment interest." *Id.* at 914.

In the context of an insurer breaching its duty to defend an insured, the Oklahoma Supreme Court has similarly made clear that only *reasonable* attorney fees are recoverable. In *First Bank of Turley*, the court held that "[i]f a duty to defend was the insured's due under the insurance contract, an insurer's refusal to defend was in breach of that obligation, which renders the insurer liable for all *reasonable* expenses incurred by an insured in defense of a third-party action." 928 P.2d at 305 (emphasis added, original emphasis omitted); *see also Iowa Home Mut. Cas. Co. v. Mussett*, 342 P.2d 553, Syll. 3, 558 (Okla. 1959) (where insurer breached duty to defend insured, insured may "recover all damages sustained by him because of such breach and in such action may recover as an element of damages *reasonable* attorney fees incurred in defense of said claim . . . ." (emphasis added)). In light of the above precedent, it is clear that attorney fees in this context are subject to a reasonableness determination by the fact finder and thus are not liquidated as required under Oklahoma law for an award of prejudgment interest.

In an attempt to avoid this conclusion, PLICO contends that because it agreed with ANPAC on a stipulated amount of damages, no reasonableness inquiry was necessary and the stipulated amount should be considered liquidated. But there is no evidence here that by stipulating to the amount of damages, ANPAC was waiving the requirement of reasonableness. To the contrary, the

-33-

motions submitted by the parties requesting additional time to reach an agreement show that the purpose of the stipulation was to avoid an evidentiary hearing on the matter, not to render the damages liquidated. It also makes practical sense not to interpret a stipulation of damages as a waiver of the reasonableness requirement because a contrary rule would penalize a defendant for stipulating and encourage needless court involvement where the parties would otherwise be capable of reaching an agreement. The district court did not clearly err in determining that the parties' stipulation did not render the damages suffered by PLICO liquidated or certain for purposes of awarding prejudgment interest.

## IV

For the reasons stated above, we AFFIRM the district court's grant of summary judgment and its order for ANPAC to pay one-half of PLICO's defense costs. We also AFFIRM the district court's denial of prejudgment interest on these damages.