**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**December 28, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

KIMBERLY S. GRAYDEN, f/k/a
Kimberly S. Pitman,

     Plaintiff - Appellant,

v.

SPRING CREEK ENERGY PARTNERS,
LLC, a Colorado limited liability company;
JASON L. EDDINGTON, individually,

     Defendants - Appellees.

No. 22-1097
(D.C. No. 1:21-CV-00106-RM-NRN)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **HARTZ**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.

_____

Kimberly Grayden claimed that Spring Creek Energy misled her into selling

one-third of her overriding royalty interests in three oil and gas leases on land in Weld

County, Colorado.  She alleged that Spring Creek misrepresented that there were no

producing wells on the land.  The district court granted summary judgment to Spring

Creek, holding that county property records put Ms. Grayden on notice of producing

wells, so her reliance on Spring Creek's misrepresentations was not justified.  Finding

---

    [*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

genuine issues of material fact as to what the records showed, and exercising jurisdiction under 28 U.S.C. § 1291, we reverse.

## I.  BACKGROUND

We begin with background on (A) oil and gas leases and (B) the factual and procedural history in this case.

### A.  *Oil and Gas Leases*

An overriding royalty interest is an interest in real property for a percentage-based share of the proceeds from oil and gas leases.  *See* Colo. Rev. Stat. § 38-30-107.5; Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 202.3 (2022) ("Williams & Meyers").  The owner receives payments from the proceeds of oil or gas production.  *See* Williams & Meyers § 202.3.  The interest terminates when the lease terminates. *See id.*

An oil and gas lease typically sets a primary term of years.  *See id.* § 604.  At the end of the primary term, the lease either terminates or enters an indefinite secondary term if certain conditions in the lease are met.  *See id.*  For the secondary term to take effect, the lessee must record an affidavit of extension.  *See* Colo. Rev. Stat. § 38-42-106(1).

An oil and gas lease may be subject to "pooling," which "refers to the aggregation of two or more tracts of land into a drilling unit of prescribed size."  Williams & Meyers § 901; *see* Colo. Rev. Stat. § 34-60-116.  Pooling is "intended to allow for more efficient oil and gas drilling by decreasing waste and avoiding drilling of unnecessary wells." *Wildgrass Oil & Gas Comm. v. Colorado*, 447 F. Supp. 3d 1051, 1057 (D. Colo. 2020) (citing Colo. Rev. Stat. § 34-60-116), *aff'd*, 843 F. App'x 120 (10th Cir. 2021).  It

2

"reduces the number of wells drilled while also compensating [interest] owners for their share of the resources extracted." *Id.* at 1057.[1]

## B. *Factual and Procedural History*

### 1. **Factual History**[2]

In 2016, Ms. Grayden inherited overriding royalty interests in three oil and gas leases located on land in Weld County, Colorado, and operated by Noble Energy. These royalty interests entitled her to a portion of the proceeds from the production of oil and gas on the land subject to these leases.

The three leases originated in 1970 or 1971 and remain in effect. Their primary terms ended in 1975 or 1976. They have been extended into the indefinite secondary term. In 2018, the leases were amended to allow for pooling. Some of the land subject to these leases has since been pooled.

In 2018, Spring Creek—a business that buys and sells mineral rights, including those for oil and gas—asked Ms. Grayden whether she would be interested in selling her royalty interests. She repeatedly told Spring Creek that she would not sell any portion of

---

[1] The term "pooling" is frequently used interchangeably or in conjunction with "unitization." *See, e.g.*, App., Vol. IV at 693 ("Declaration of Pooling and Unitization"). As properly used, "pooling" means "the bringing together of small tracts sufficient for the granting of a well permit," and "unitization" means "the joint operation of all or some part of a producing reservoir." Williams & Meyers § 901. For this appeal, the distinction between pooling and unitization is not material.

[2] We draw the following facts from the parties' statements of undisputed material facts; the county records in the appendix; the deposition testimony of Jason Eddington, Spring Creek Energy's principal; and the declaration of Tracy Lenz, Ms. Grayden's mineral rights expert.

her royalty interests in leases associated with then-producing oil and gas wells. She believed at the time there were none. Spring Creek told her there were no then-producing wells on the land. In March 2020, Ms. Grayden and Spring Creek executed a Purchase and Sale Agreement. She ultimately agreed to sell one third of her royalty interests for $401,535.50. Ms. Grayden alleged she agreed to this sale based on Spring Creek's misrepresentations.[3]

2. **Procedural History**

a. *District court proceedings*

In January 2021, Ms. Grayden filed a diversity action in the District of Colorado against Spring Creek, asserting fraudulent concealment, unjust enrichment, unilateral mistake, and civil theft claims. Her "core claim is that [Spring Creek] intentionally misled her . . . about the state of oil and gas activity on the land in which she inherited overriding royalty interests in Weld County, Colorado." Aplt. Br. at 8.

Spring Creek moved for summary judgment on all claims. A magistrate judge recommended granting summary judgment for Spring Creek on Ms. Grayden's unjust enrichment claim and denying summary judgment on the other claims.

---

[3] Ms. Grayden said she discovered in May 2020 there was ongoing oil and gas production on the land. Noble Energy, the company operating the oil and gas leases, contacted Ms. Grayden and explained that she had not been receiving royalty payments due to confusion about the transfer of interests from her deceased aunt's estate. Noble had been prompted to contact Ms. Grayden when Spring Creek sought to collect from Noble the undisbursed royalty payments Ms. Grayden was owed.

Before the district court, Spring Creek objected to the magistrate judge's recommendation. It asked the court to take judicial notice of affidavits of extension and pooling documents filed by Noble with the county recorder.

The affidavits of extension consist of:

1. Four Affidavits of Extension of Oil and Gas Leases from 2012, all stating that a certain well "has been drilled and completed and is producing or capable of producing oil and/or gas." App., Vol. IV at 681-88.

2. Two Affidavits of Extension of Oil and Gas Leases from 2019, both stating that certain wells have "been drilled and completed and are producing or capable of producing oil and/or gas." *Id.* at 723, 731.

The pooling documents consist of:

1. Two Agreements to Amend and Ratify Oil and Gas Lease from 2018. The amendments add a right to pool or unitize land and interests subject to the lease, which is accomplished by the lessee executing and filing of record a declaration. *Id.* at 689, 691.

2. Eleven Declarations of Pooling and Unitization from 2018 and 2020. Each declaration states that it "does hereby pool, combine and designate the following lands and the leasehold, mineral and royalty rights thereunder, as a Unit for the drilling and production of oil and gas from the [well]." *Id.* at 693, 696, 699, 711, 714, 717, 720, 735, 738, 740, 743.

3. Four Amendments to Declaration of Pooling and Unitization from 2018 and 2020. The amendments correct errors and omissions that do not change the substance of the declarations. *Id.* at 702, 705, 708, 746.

In its request for judicial notice, Spring Creek asserted that "[p]ursuant to Colorado law, an owner of real property is on constructive notice of filings with the clerk and recorder's office affecting the title to such property," and that Ms. Grayden was on constructive notice of these documents. *See id.* at 678 (citing Colo. Rev. Stat. § 38-35-106(1)).

The district court took judicial notice of the documents. It also allowed the parties to file supplemental summary judgment briefs. The court then granted summary judgment for Spring Creek. It held the county records put Ms. Grayden on constructive notice of producing wells, so her reliance on Spring Creek's misrepresentations was not justified.[4]

Ms. Grayden timely appealed the grant of summary judgment.

b. *Appellate proceedings*

While this appeal was pending, Spring Creek filed a motion asking this court to take judicial notice of the underlying oil and gas leases, which were not in the district court record. Ms. Grayden initially opposed this request, but the parties eventually jointly moved to supplement the appendix with the leases. They also stipulated to the leases' existence and recording.

We granted the parties' request to supplement the appendix.[5] The three leases—all from 1970 or 1971—contain similar terms. Each lease provided:

1. A primary term of five years (setting an expiration date in 1975 or 1976), with an indefinite secondary term so long as oil and gas "is or can be produced." Suppl. App. at 1; *see also id.* at 3 (indefinite secondary term for

---

[4] The district court "reject[ed] the magistrate judge's Recommendation because . . . it [was] moot" based on the documents Spring Creek had filed. App., Vol. IV at 811. It explained that the "county records subsequently produced by [Spring Creek] and judicially noticed by the Court have placed this case in a new posture." *Id.* at 813.

[5] We deny Spring Creek's motion for judicial notice, Doc. 10924691, as moot given the parties' joint stipulation and supplementation request.

6

"as long thereafter as oil or gas, or either of them, is produced from said land . . . or the premises are being developed or operated"); *id.* at 5 (same).[6]

2.  "If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any case," the lease "shall not terminate provided lessee resumes operations for re-working or drilling a well . . . and this lease shall remain in force during the prosecution of such operations." *Id.* at 1; *see also id.* at 3 (same); *id.* at 5 (same).

## II.  **DISCUSSION**

On appeal, Ms. Grayden argues that the district court erred in granting summary judgment to Spring Creek.  She contends the district court erred in concluding her claims were barred as a matter of law due to constructive notice that there was ongoing oil and gas production on the land.

### A.  *Standard of Review*

We review a district court's grant of summary judgment de novo, applying the same standards as the district court.  *See Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 730 (10th Cir. 2020).  We will affirm summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 638 (10th Cir. 2022) (quotations omitted). We draw all reasonable inferences and resolve factual disputes in favor of the nonmoving party, Ms. Grayden.  *See Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014).

---

[6] Although this language differs slightly in the three leases, the provisions are substantially similar, and any differences are not material to this appeal.

B. *Analysis*[7]

We assume that Ms. Grayden was on constructive notice of the county records[8] and resolve the appeal based on the text of the records.

Spring Creek argues the affidavits of extension and pooling documents put Ms. Grayden on constructive notice of ongoing oil and gas production and bar her claims.[9] We address whether the records indicated ongoing oil and gas production.

1. **Affidavits of Extension**

We conclude there is a genuine issue of material fact as to whether the 2012 and 2019 affidavits of extension show the wells were producing when Ms. Grayden sold her royalty interests.

---

[7] The parties agree that Colorado law governs. *See* Aplt. Br. at 30; Aplee. Br. at 2. This court is bound by the Colorado Supreme Court's interpretation of its State laws. *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1223 (10th Cir. 2016). Our analysis focuses on the recorded documents rather than Colorado law.

[8] We therefore do not address Ms. Grayden's argument that she was not on constructive notice of certain sets of documents. We also do not address her argument that constructive notice does not bar fraud and rescission claims.

[9] The Colorado Recording Act states:
> Any written instrument required or permitted to be acknowledged affecting title to real property, whether acknowledged, unacknowledged, or defectively acknowledged, after being recorded in the office of the county clerk and recorder of the county where the real property is situate, shall be notice to all persons or classes of persons claiming any interest in said property.

Colo. Rev. Stat. § 38-35-106(1).

The 2012 and 2019 affidavits of extension are ambiguous as to whether the wells were producing.[10]  They state that a well has "been drilled and completed" and is "producing or capable of producing oil and/or gas."  App., Vol. IV at 723, 731.  Thus, either a well "is producing" oil and gas, or it is not producing but is "capable of producing" oil and gas.  *Id.*; *see Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 826 (Colo. 2016) (to review "recorded instruments," "we give words and phrases their common meanings," and seek to "give effect to all provisions so that none will be rendered meaningless") (quotations omitted); *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022) (a written instrument's terms are ambiguous when they "are susceptible of more than one reasonable interpretation").  A well that is capable of producing oil and gas is not necessarily a then-producing well.  *See* Williams & Meyers § 603 (the phrase "capable of producing oil and/or gas" means that the lease "can be maintained without actual production"); *see also Yates Petroleum Corp.*, 188 Interior Dec. 321, 325-26 (IBLA 2016) (a completed well "capable of production, but where production has been deferred" may occur when there is a "lack of pipelines, roads, or markets for the gas").

As Ms. Grayden stated, "In order for one to determine whether . . . production is continued," the affidavits alone do not answer that question—one "would be required to

---

[10] The district court noted that Spring Creek contended the affidavits "placed [Ms. Grayden] on 'constructive notice' of ongoing oil and gas production associated with her royalty interests."  App., Vol. IV at 815.  But the court took judicial notice of these records without addressing their language and held there were no genuine issues of material fact for a jury.  *Id.* at 817.

look to the terms of the lease itself, and the actual facts of any continued production."

Aplt. Br. at 25.  Thus, looking at these affidavits alone, "a reasonable jury could return a

verdict for the nonmoving party," finding Ms. Grayden would have needed more

information beyond what the affidavits state to be on notice of ongoing oil and gas

production.  *Bimbo Bakeries*, 29 F.4th at 638.[11]

Spring Creek's arguments to the contrary are unpersuasive.  It asserts that "[t]he

affidavits of lease extension showed that the leases had been extended by production."

Aplee. Br. at 19.  We disagree.  Filing an affidavit of extension does not necessarily

indicate ongoing production.  Rather than show the leases were extended by production,

the affidavits show there were wells on the land either (1) currently producing or (2) not

currently producing but capable of doing so.

Spring Creek contends "the underlying leases would have expired without ongoing

production." *Id*.  Again, we disagree.  The leases provide for continuation of the

indefinite secondary term without ongoing production:  "If, after the expiration of the

primary term of this lease, production on the leased premises shall cease from any case,"

the lease "shall not terminate provided lessee resumes operations for re-working or

drilling a well . . . and this lease shall remain in force during the prosecution of such

---

[11] Further, the 2012 affidavits of extension referenced wells that stopped producing by the summer of 2018.  App., Vol. IV at 782 (Decl. of Tracy Lenz) ("[E]ach of the wells referenced by the pre-2015 affidavits of extension . . . stopped producing by July 2018 . . . .").

operations." Suppl. App. at 1; *see also id.* at 3 (same); *id.* at 5 (same). The leases thus do not terminate if production stops.

In sum, there is a genuine issue of material fact as to whether the affidavits of extension show the wells were producing when Ms. Grayden sold her royalty interests. Summary judgment for Spring Creek was thus improper on this ground.

2. **Pooling Documents**

We next turn to whether the pooling documents provided notice of ongoing oil and gas production. We conclude there is a genuine issue of material fact as to whether the pooling amendments and declarations show ongoing production.

There are three sets of relevant pooling documents: (1) the amendments to the leases adding a right to pool land and interests, (2) the declarations of pooling and unitization, and (3) the amendments to the declarations of pooling and unitization.

First, the amendments to the leases adding a right to pool land and interests do not show ongoing oil and gas production. These amendments allow a right to pool or unitize land and interests subject to the lease, and they explain that pooling is accomplished by the lessee executing and filing of record a declaration. *See* App., Vol. IV at 689; *see also id.* at 691. But they do not assert any facts about ongoing production on the land subject to the leases.

Second, the declarations of pooling and unitization from 2018 and 2020 similarly do not show ongoing oil and gas production. Each declaration states it "does hereby pool, combine and designate the following lands and the leasehold, mineral and royalty rights thereunder, as a Unit for the drilling and production of oil and gas from the [well]."

*Id.* at 693; *see also id.* at 696, 699, 711, 714, 717, 720, 735, 738, 740, 743. Stating that the lands are pooled "for the drilling and production of oil and gas" does not show current oil and gas production at the time of the declaration.

Nor is the act of filing of a pooling declaration indicative of ongoing production. Its legal effect is a declaration that land has been aggregated into "drilling units of specified size and shape." Colo. Rev. Stat. § 34-60-116. It does not necessarily indicate ongoing production as opposed to, for example, planned future production.

Third, the amendments to the declarations of pooling and unitization from 2018 and 2020 do not allege ongoing production. Each adds an exhibit listing the "lands, leases, and interests lying within the pooled area." App., Vol. IV at 702; *see also id.* at 705, 708, 746. These amendments are silent about production.

In sum, none of the pooling documents show ongoing oil and gas production on the land, leaving a genuine issue of material fact regarding whether Ms. Grayden was on notice of ongoing production when she sold her royalty interests. Summary judgment was therefore improper.

### III. CONCLUSION

We reverse summary judgment for Spring Creek.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge