[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11350
_____

D.C. Docket Nos. 0:14-cv-60629-RLR;
0:14-cv-61415-RLR

BROWN JORDAN INTERNATIONAL, INC.,
BJI HOLDINGS, LLC,
BROWN JORDAN SERVICES, INC.,
BROWN JORDAN COMPANY,

                                        Plaintiffs - Appellees,

versus

CHRISTOPHER CARMICLE,

                                        Defendant - Appellant.

_____


CHRISTOPHER CARMICLE,

                                        Plaintiff - Appellant,

versus

BJI HOLDINGS, LLC,
BROWN JORDAN INTERNATIONAL, INC.,
BROWN JORDAN SERVICES, INC.,

GENE J. MORIARTY,
VINCENT A. TORTORICI, JR., et al.,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 25, 2017)

Before MARCUS and BLACK, Circuit Judges, and COHEN,[*] District Judge.

BLACK, Circuit Judge:

This case arises out of Christopher Carmicle's termination from Brown Jordan[1] in early 2014. The parties filed cross-complaints, and the two cases were consolidated. After granting summary judgment in favor of Brown Jordan on some of Carmicle's claims, the district court conducted an 11-day bench trial and entered judgment on behalf of Brown Jordan. Carmicle appeals, raising issues regarding the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, the Stored Communications Act (SCA), 18 U.S.C. § 2701, wrongful discharge, and breach of an employment agreement.

We affirm the district court. Carmicle's CFAA arguments fail because Brown Jordan suffered "loss" as defined in the CFAA. As to his SCA issues,

[*] Honorable Mark Howard Cohen, United States District Judge, for the Northern District of Georgia, sitting by designation.

[1] We refer collectively to the Appellees as "Brown Jordan."

Carmicle waived his unopened-versus-opened-email argument because he did not fairly present it to the district court, and Brown Jordan showed Carmicle exceeded his authorization in accessing the emails of other Brown Jordan employees. Lastly, the district court did not err in granting summary judgment on Carmicle's wrongful discharge claim or in concluding that Carmicle was terminated for cause as defined by the Employment Agreement.

## I.  BACKGROUND

*A.  Factual Background*

Carmicle began working for Brown Jordan in 2002.  Carmicle rose swiftly through the ranks at Brown Jordan, the parent company of a number of entities engaged in the manufacture and sale of furniture for residential and commercial use.  By 2005, Carmicle was responsible for the national accounts of Brown Jordan, which soon after led to his responsibility for a Brown Jordan subsidiary, Brown Jordan Services.  According to Brown Jordan, Carmicle was never formally appointed as president of Brown Jordan Services, but was permitted to use the title as a "customer facing accommodation."

When Gene Moriarty became CEO of Brown Jordan, Moriarty requested Carmicle enter into an Executive Employment Agreement with Brown Jordan. The November 1, 2005 agreement solidified the terms of Carmicle's employment and is the only written employment agreement between Carmicle and Brown

3

Jordan. Carmicle subsequently entered into Profits Interest Agreements with Brown Jordan, pursuant to which Carmicle acquired a profits interest in BJI Holdings, LLC, subject to the Agreements' vesting and forfeiture provisions.

Moriarty testified that he and others began to have doubts about Carmicle around 2011. Indication that Carmicle had been incurring excessive entertainment expenses began to appear. It was also discovered that Carmicle's wife was on Brown Jordan's payroll and Carmicle himself approved her salary. After a stern warning about these actions, Moriarty gave Carmicle a second chance. Moriarty also gave Carmicle greater responsibility making him responsible for Brown Jordan Company, another Brown Jordan subsidiary, in addition to Brown Jordan Services.

In 2013, Moriarty learned that Carmicle had breached his trust again by incurring more unauthorized expenses. As far as Moriarty was concerned, Carmicle had blown his second chance. Moriarty was ready to terminate Carmicle's employment for cause.

However, Moriarty was persuaded not to pursue termination at that time. In the spring of 2013, Brown Jordan's Board of Directors decided to hire an investment bank and offer Brown Jordan for sale. Brown Jordan would be sold as a whole to a single buyer, or alternatively, the commercial and consumer businesses would be divided and offered to separate purchasers. In the event

4

Brown Jordan were sold separately, Moriarty would likely remain with the commercial business and Carmicle would remain with the consumer business, so Moriarty would no longer have to work with Carmicle and the buyer of the consumer business would have the benefit of continuity. Moriarty ultimately agreed that it was best not to terminate Carmicle's employment while Brown Jordan was offered for sale.

In the meantime, Moriarty, Brown Jordan's CFO, and Brown Jordan's General Counsel decided to pursue a management buyout (MBO) of the commercial business. In connection with seeking lending to finance the MBO, they prepared a financial model that differed from that prepared by Brown Jordan's investment bank for potential outside buyers.

In the summer of 2013, Brown Jordan began a transition from one email service to another. To assist in that transition, Brown Jordan's Chief Information Officer provided a generic password—Password1—to Brown Jordan employees and instructed each to test his or her new email account with that password.

Carmicle testified that he was suspicious that a subordinate employee he considered difficult to manage was communicating directly with Moriarty, and that both were lying to Carmicle about a personnel issue. This prompted Carmicle to use the generic password to access their accounts and read their emails. From there, Carmicle's behavior began to snowball. Carmicle repeatedly accessed the

5

email accounts of other employees, including his superiors, with the generic password and used his personal iPad to take screenshots of hundreds of emails over the next six months.  Along the way, Carmicle learned about the MBO and the second financial model.  Carmicle also learned that Brown Jordan's CFO was scrutinizing his expenses.

As 2014 began, it became clear that Brown Jordan Services and Brown Jordan Company had not performed well.  Brown Jordan's Board of Directors was scheduled to meet in early 2014, and the poor performance of Brown Jordan Services and Brown Jordan Company were on the agenda.  In an attempt to save his job, Carmicle wrote a letter to Brown Jordan's Board of Directors in January of 2014, accusing Moriarty and others of various illegal and fraudulent activities, including their preparation of a second financial model to the detriment of shareholder value in an attempt to secure the consumer business through an MBO.

Concerned about Carmicle's accusations, and because Carmicle had expressed a fear of retaliation, the Board of Directors hired an independent investigator.  During the investigation into Carmicle's allegations, Carmicle revealed to the investigator that he had learned much of the information contained in his letter by accessing others' email accounts.  The investigator ultimately concluded Carmicle's allegations were entirely without merit, and reported that fact to the Board of Directors.  The investigator also reported Carmicle's email

6

access and the fact Carmicle had used in excess of $100,000.00 in Brown Jordan

funds for unauthorized entertainment expenses.  When the Board of Directors met

in February 2014, they decided that Carmicle's employment should be terminated

for cause.

On February 17, 2014, Moriarty met with Carmicle and informed him of the

decision to terminate his employment for cause.  Carmicle demanded that he be

permitted to take his personal laptop with him when he left, but was told it would

not be returned to him until Carmicle proved he had used his own funds to

purchase the laptop.  As soon as he returned home, Carmicle used the "Find My

iPhone" application to remotely lock a different laptop owned by Brown Jordan,

rendering it inaccessible.  Carmicle claimed he intended to lock his personal

laptop, and inadvertently locked the Brown Jordan-owned laptop.  Carmicle also

claims to have subsequently lost the personal iPad with which he had taken

screenshots of emails, and was therefore unable to produce it during the course of

discovery.

## B.  Procedural Background

On March 11, 2014, Brown Jordan filed its initial Complaint against

Christopher Carmicle in the Southern District of Florida, asserting, among other

things (1) violation of the CFAA; (2) violation of the SCA; and (3) a declaration

7

that Carmicle's termination amounted to "cause" under their written employment agreement.

Ten days later, Carmicle filed his initial complaint against Brown Jordan in Kentucky state court. He asserted numerous claims, but only two claims are at issue on appeal (1) wrongful termination, and (2) breach of contract. Carmicle's complaint was removed to federal court and transferred to the Southern District of Florida. The two cases were then consolidated.

The district court denied both Carmicle's motion to dismiss and for partial summary judgment as to Brown Jordan's CFAA and SCA claims, and granted Brown Jordan's motion for summary judgment on several claims, including Carmicle's wrongful termination claim.

The court then conducted an 11-day bench trial. In a lengthy memorandum opinion, the district court concluded Carmicle's employment was terminated for cause (and that therefore Carmicle was not entitled to any profits interest or severance pay) due to his improper access of other employees' email accounts. The district court also concluded the access of the email accounts violated the CFAA and SCA.

## II.  DISCUSSION

### A.  Computer Fraud and Abuse Act

Carmicle appeals the district court's conclusion that he violated the CFAA. Carmicle contends the evidence established Brown Jordan suffered no loss as it is defined in the CFAA because he caused no damage to Brown Jordan's computer system and there was no "interruption of service."  The loss Brown Jordan claims it incurred stems from a payment to an outside consultant, Crowe Horwath, to assess how Carmicle accessed the emails, and a payment to a contractor, Kroll, to sweep the office building for audio and video surveillance devices.  Based on these payments, the district court found Brown Jordan sustained a "loss" within the meaning of the CFAA and awarded Brown Jordan damages.

Carmicle asserts there are two reasons that the alleged damages do not meet the CFAA's definition of "loss":  (1) Brown Jordan's "loss" did not stem from an "interruption of service;" and (2) Brown Jordan admits there was no damage to its computers and it paid no money to remedy such damage—specifically the fee Brown Jordan paid Crowe Horwath was unnecessary, and the fee Brown Jordan paid Kroll to sweep its building for surveillance does not relate to Brown Jordan's computers at all and is not a compensable loss under the CFAA.

*1.  Interruption of Service*

Whether Carmicle violated the CFAA is a mixed question of law and fact, which we review *de novo.  Reynolds v. McInnes*, 338 F.3d 1201, 1211 (11th Cir. 2013).  To the extent this issue involves the interpretation of the CFAA, it is a question of law we review *de novo.  Vista Mktg.*, *LLC v. Burkett*, 812 F.3d 954, 962 (11th Cir. 2016).

"Whoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer" violates the CFAA.  18 U.S.C. § 1030(a)(2)(C).  "A civil action for a violation of this section may be brought *only if* the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."  18 U.S.C. § 1030(g) (emphasis added).  Subclause (I), applicable to the instant case, permits an action only if the plaintiff incurs a minimum "loss" of $5,000 as a result of the defendant's violation of the CFAA.  18 U.S.C. § 1030(c)(4)(A)(i)(I).  The CFAA provides that:

> the term "loss" means any reasonable cost to any victim, including the
> cost of responding to an offense, conducting a damage assessment,
> and restoring the data, program, system, or information to its
> condition prior to the offenses, and any revenue lost, cost incurred, or
> other consequential damages incurred because of interruption of
> service.

18 U.S.C. § 1030(e)(11).

The interpretation of "loss" as defined by 18 U.S.C. § 1030(e)(11) is an issue of first impression in our Circuit.  "As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear."  *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc).  When we construe a statute, "we must begin, and often should end as well, with the language of the statute itself." *Id.* (quotations omitted).

Two circuits have interpreted the definition of "loss" as set forth in 18 U.S.C. § 1030(e)(11) to include the cost of responding to the offense, irrespective of whether there was an interruption of service.  *See Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073-74 (6th Cir. 2014); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009).  The *Yoder* court explained its reasoning:

> "Loss" is defined in the disjunctive—it includes "any reasonable cost to any victim including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense."  18 U.S.C. § 1030(e)(11).  It also encompasses "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.*  If a plaintiff is able to establish a loss of at least $5,000 in value, whether that be composed solely of costs identified in the first clause, or solely costs identified in the second clause, or a combination of both, then he may recover under the statute.

*Yoder*, 774 F.3d at 1073.

11

Although no Court of Appeals has interpreted the statute to require an interruption of service in all cases, a more narrow view followed by some district courts requires that any loss under the CFAA be the result of an "interruption of service." *See, e.g.*, *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1371 (S.D. Fla. 2009). The court in *Continental Group* reasoned as follows:

> This Court . . . concludes that all loss must be as a result of "interruption of service." Otherwise, it would appear that the second half of the "loss" definition is surplusage. If loss could be any reasonable cost without any interruption of service, then why would there even be a second half to the definition that limits some costs to an interruption of service. Rather, the better reading (though reasonable minds surely can differ until the Court of Appeals decides the issue) appears to be that all "loss" must be the result of an interruption of service. This conclusion is supported by the legislative intent in the CFAA, a criminal statute, to address interruption of service and damage to protected computers.

*Id.*

We agree with the Fourth and Sixth Circuits. The plain language of the statutory definition includes two separate types of loss: (1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. *See* 18 U.S.C. § 1030(e)(11). The statute is written in the disjunctive, making the first type of loss independent of an interruption of service. *Yoder*, 774 F.3d at 1073.

12

Contrary to the assertion of the court in *Continental Group*, this interpretation does not reduce "interruption of service" to surplusage. *See Cont'l Grp.*, 622 F. Supp. 2d at 1371. "Loss" includes the direct costs of responding to the violation in the first portion of the definition, and consequential damages resulting from interruption of service in the second. Thus, under a plain reading of the statute, Brown Jordan's loss from Carmicle's violation of the CFAA does not need to be related to an interruption of service in order to be compensable.

### 2. *Damages*

As to Carmicle's argument that Brown Jordan's expenses were unnecessary and were therefore not compensable, the district court made a finding of fact that "[a]lthough Carmicle told [Brown Jordan] that he had accessed others' emails using that generic password before [Brown Jordan] retained Crowe Horwath, [Brown Jordan] was unwilling to accept Carmicle's word under the circumstances." During its investigation, Crowe Horwath was unable to access the Brown Jordan-owned laptop because the password and PIN necessary to unlock the laptop were not provided. While Brown Jordan was aware of one way that Carmicle claimed he had accessed their systems, they had reason to doubt his credibility. It was therefore reasonable for Brown Jordan to hire both Crowe Horwath and Kroll to engage in an extensive forensic and physical review of Brown Jordan's systems to determine the extent of Carmicle's hacking activity.

13

These losses were incurred in the course of responding to the offense[2] and are therefore compensable under the CFAA. *See* 18 U.S.C. § 1030(e)(11).

## B. Stored Communications Act

The district court determined that Carmicle violated the SCA when he accessed other employees' emails without authorization. Carmicle contends he did not violate the SCA because the emails Carmicle accessed were not held in "electronic storage" as that term is defined by the SCA and because his email access was authorized.

Anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided; or . . . intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system" is liable pursuant to the SCA. 18 U.S.C. § 2701(a); *see also Vista Mktg.*, 812 F.3d at 962. As with the CFAA issue above, whether Carmicle violated the SCA is a mixed question of law and fact, which we review *de novo*. *Reynolds*, 338 F.3d at 1211. To the extent this issue involves the interpretation of the SCA, it is a question of law we review *de novo*. *Vista Mktg.*, 812 F.3d at 962.

---

[2] Carmicle also contends there can be no loss under the CFAA unless it relates to fixing damage to a computer or network. However, the definition of loss includes "*any reasonable cost to any victim, including the cost of responding to an offense . . . .*" 18 U.S.C. § 1030(e)(11) (emphasis added). The reasonable cost of responding to the offense—in this case, the unauthorized email access—is not limited to damage to a computer or network.

14

*1. Whether the emails Carmicle accessed were in "electronic storage"*

On appeal, Carmicle contends the emails he accessed were not in "electronic storage" as that term is defined by the SCA because the emails had already been opened by their intended recipients at the time he accessed them. Carmicle concedes there is a split of authority over this issue, but asserts that the more reasonable reading of the SCA exempts previously opened emails from the purview of the statute.

The unopened-versus-opened-email issue was raised to our court in *Vista Marketing*. We did not decide the issue in that case because the defendant conceded that at least some of the emails were unopened by their intended recipient at the time the defendant read them. *Id.* at 963. We noted that "much debate" surrounded the issue. *Id.* (citing *Theofel v. Farey-Jones*, 341 F.3d 978 (9th Cir. 2003), *as amended by* 359 F.3d 1066 (9th Cir. 2004); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511-12 (S.D.N.Y. 2001); *Cheng v. Romo*, No. 11-10007-DJC, 2013 WL 6814691, *3-4 (D. Mass. Dec. 20, 2013); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555-56 (S.D.N.Y. 2008); Comput. Crime & Intellectual Prop. Section, Exec. Office for U.S. Attorneys, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, at 124 (3d ed. 2009); Orin Kerr, *A User's Guide to the*

15

*Stored Communications Act and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208 (2004)).

Once again, as in *Vista Marketing*, we will not "wade into the discussion" of this complicated issue, but for a different reason. *See Vista Mktg.*, 812 F.3d at 963. Here, Carmicle did not fairly present the unopened-versus-opened-email issue to the district court. We are unable to reach the merits of this issue of first impression in our Circuit because "[w]e cannot allow [Carmicle] to argue a different case from the case [he] presented to the district court." *See Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998). "As an appellate court with no fact finding mechanism, and, indeed without any factual averments made in the trial court, we are naturally hesitant to consider this claim." *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

The facts supporting Carmicle's assertion that he never accessed unopened emails were never explained in any document or argument before the district court, and no discovery was ever conducted about them. *See id.* at 1332. When Brown Jordan stated its position on the issue, Carmicle disavowed he was arguing for a distinction between unopened and opened email, and put forth no facts that would support his claim. Thus, "it would be improvident for us to try to grapple with the important question whether" email that has already been opened by its intended recipient fits into the definition of "electronic storage" in the SCA. *Id.* We detail

16

Carmicle's argument in the district court as to this issue to illustrate how the issue was not fairly presented.

The unopened-versus-opened-email argument was most clearly presented in Carmicle's motion to dismiss. He contended, in one sentence, that the SCA was inapplicable to the facts of his case because "an opened but undeleted email sitting on a server is not a 'stored communication' within the meaning of the SCA," and cited two district court cases for the proposition.

By the time Carmicle filed his partial motion for summary judgment, the focus of his argument had changed. Any reference to unopened or opened email vanished. Instead, his argument was that any message sitting in a recipient's inbox, whether unopened or opened by the intended recipient, is not a "stored communication." Carmicle contended the only time a message is a stored communication is during the brief interval when an email service stores a message until the addressee downloads it. Carmicle asserted the only way the SCA could be implicated is if a defendant "literally 'intercept[s]' the transmission during its transmission." Carmicle also asserted that the emails were not held in storage by an internet service provider (ISP) for backup protection, but never mentioned the unopened-versus-opened-email distinction.

Brown Jordan's opposition to Carmicle's motion for partial summary judgment contended that "[c]ourts have not distinguished between unopened and

17

opened email communications for the purposes of the SCA," and included cases supporting its interpretation of the unopened-versus-opened-email issue. *See Theofel*, 359 F.3d at 1075, 1077; *Pure Power Boot Camp*, 587 F. Supp. 2d at 556; *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 977 (M.D. Tenn. 2008). Carmicle's reply in support of his motion for summary judgment made clear that he was not arguing the unopened-versus-opened-email issue, stating:

> Nor were the emails which Carmicle accessed "stored communications" as is required by the SCA. *BJI's argument that there is no differentiation between opened or unopened email misses the point.* Stored communications are those which are held by the ISP immediately prior to delivery or stored by the ISP for back up. *They are* not *emails which have been delivered locally and are resting in the inbox to which they were delivered*.

(Emphasis added). Thus, Carmicle disavowed that he was arguing for a distinction between unopened and opened email; rather, he was arguing that *any* email located in an intended recipient's inbox, whether unopened or opened, was not covered by the SCA.

This was the last reference to the issue of unopened versus opened email by the parties. During the 11-day trial in this case, neither Carmicle nor Brown Jordan elicited any trial testimony on the subject, and Carmicle made no reference to the issue in his pre-trial or post-trial proposed Conclusions of Law and Findings of Fact. In contrast, on appeal, Carmicle fully briefs the issue.

18

Carmicle had an opportunity to fairly present this argument before the district court, but did not do so. Accordingly, this circumstance is not one in which we elect to evaluate an issue not fairly presented to the district court.[3] *See Access Now*, 385 F.3d at 1332.

2. *Whether Carmicle's email access was authorized*

Carmicle also contends he did not violate the SCA because his email access was authorized. His argument is that Brown Jordan's company policy states that:

> [E]mployees at [Brown Jordan] should have *no expectation of privacy* while using company-owned or company-leased equipment. Information passing through or stored on [Brown Jordan] equipment can and will be monitored. Employees should also understand that [Brown Jordan] *has the right to monitor and review Internet use and e-mail communications sent or received by employees.* Access to another employee's e-mail and internet usage is controlled by senior management. No IT staff person is authorized to give out passwords to users other than the account holder without the permission of senior management. Managers and employees who need access for legitimate [Brown Jordan] purposes to another employee's e-mail must request such access from a member of corporate senior management.

(Emphasis in original). Carmicle contends that because he was a member of "senior management" he was not required to request access from a member of corporate senior management.

---

[3] While we may choose to hear an argument fairly presented for the first time on appeal in special circumstances, the issue here does not meet any of the five circumstances in which we will consider such an issue. *See Access Now*, 385 F.3d at 1332.

19

The district court concluded that even though the Computer and Internet Policy uses the terms "employees," "managers," "senior management," and "corporate senior management" without definition, it found no ambiguity as to whether Carmicle's use of the generic password was authorized.  The district court determined it would be "unreasonable to interpret the Computer and Internet Policy as authorizing [Carmicle] to exploit a generic password—which by happenstance permitted Carmicle to access others' email accounts without requesting such access through appropriate and otherwise necessary channels—solely on suspicion of dishonesty concerning the content of communications between others, without any reason to suspect wrongful or illegal conduct prior to doing so."  We agree.  The district court did not err in determining Carmicle's email access was unauthorized.

In sum, Carmicle's arguments regarding the SCA are either waived or fail on their merits.[4]  We affirm the district court's conclusion that Carmicle's actions violated the SCA.

---

[4] We also reject Carmicle's argument that he did not access a "facility" within the meaning of the SCA.  The language of the SCA requires intentionally accessing without (or exceeding) authorization "a *facility* through which an electronic communication service is provided."  18 U.S.C. § 2701(a) (emphasis added).  The SCA does not define "facility," *see Garcia v. City of Laredo*, 702 F.3d 788, 792 (5th Cir. 2012); however, the Oxford English Dictionary definition of "facility" includes "the physical means or equipment for doing something," Oxford English Dictionary Online, http://www.oed.com/viewdictionary entry/Entry/67465.  "Electronic communication service" is defined as "any service which provides users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).

20

*C. Wrongful Discharge*

Carmicle argues the district court erred in granting summary judgment in favor of Brown Jordan on Carmicle's wrongful discharge claim. He asserts that under Kentucky law,[5] his discharge for reporting fraud and breach of fiduciary duty on the part of senior management is actionable.

Under Kentucky law, there are only two situations where an employer's reason for discharging an employee is so contrary to public policy as to be actionable: (1) "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment," or (2) "when the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment." *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985) (quotation omitted). Carmicle asserted a wrongful discharge claim under the second situation recognized by *Grzyb*, alleging he was terminated after he provided information on improper activities, and the district court addressed that issue.

---

Brown Jordan presented evidence that Carmicle used a generic password to access the Microsoft Office 365 program, a cloud-based service. Microsoft Office 365 provides the ability to send and receive emails. Thus, Microsoft Office 365 is a facility through which an electronic communication service is provided.

[5] Both parties agree that Kentucky law applies to this issue because the termination occurred in Kentucky.

21

Carmicle also attempted to assert a claim under the first situation, but the district court denied amendment because the amended pleadings deadline had passed.[6]

The district court did not err[7] in granting Brown Jordan's motion for summary judgment on this issue. Carmicle argued he was terminated after providing information that corporate officers violated or were violating their fiduciary duties to Brown Jordan. Carmicle premised his claim on the following statute:

> An officer with discretionary authority shall discharge his duties under that authority:
>
> (a) In good faith;
> (b) On an informed basis; and
> (c) In a manner he honestly believes to be in the best interests of the corporation.

Ky. Rev. Stat. § 271B.8-420(1).

Carmicle contends this statute shows he had fiduciary duties to Brown Jordan, and acting or failing to act otherwise than in good faith in the discharge of his duties could have subjected him to liability. Accordingly, he argues, there is a "clear, strong legislative expressing of public policy against" breaches of fiduciary

---

[6] Carmicle tries to weave the public policy and violation of law arguments together in his initial brief, but does not appeal the district court's refusal to allow him to amend his complaint to add allegations under the second prong.

[7] We review the district court's grant of summary judgment *de novo*. *Fish v. Brown*, 838 F.3d 1153, 1156 (11th Cir. 2016).

duty in Kentucky.  *See Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010).

But even assuming that this statute could support a wrongful discharge claim, the district court correctly concluded that the statute Carmicle cited did not apply because he was not a director or corporate officer.  Brown Jordan provided evidence that Carmicle was not a corporate officer, and that his title of president was an honorary one only.  Carmicle's status was that of a managerial employee and Carmicle only had a "belief" that he was a corporate officer.  The district court did not err in granting Brown Jordan summary judgment on this issue.

## D.  Termination for Cause

Carmicle contends that in determining Carmicle was terminated for cause as defined by the Employment Agreement, the district court ignored the requirement that Carmicle be given notice of his alleged negligence or misconduct in writing, and be given an opportunity to cure any such misconduct.  He also argues that the court erred in determining that each time Carmicle accessed the email of another employee, he committed a separate occurrence of gross negligence or willful misconduct.

At stake in this issue is Carmicle's entitlement to profits interest and severance pay.  The Executive Employment Agreement he entered into with Brown Jordan defines "cause," among other things, as:

23

[T]he Executive's gross negligence or willful misconduct in the performance of his duties as an employee of [Brown Jordan] that is not cured within seven (7) days following written notice by [Brown Jordan] to the Executive of such gross negligence or willful misconduct, or three (3) occurrences of the Executive's gross negligence or willful misconduct in any twelve-month period . . . .

The district court first concluded that the contract was governed by Florida law, as stated in the contract. "In interpreting a contract under Florida law, we give effect to the plain language of contracts when that language is clear and unambiguous." *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.¸* 556 F.3d 1232, 1242 (11th Cir. 2009) (quotations omitted). The district court concluded this language unambiguously establishes two separate grounds for termination with cause: (1) a single occurrence of gross negligence or willful misconduct that is not cured within seven days following written notice thereof, or (2) three occurrences of gross negligence or willful misconduct in any twelve-month period, written notice of which is not required.

The district court did not err. The district court's interpretation of the employment agreement is reasonable. As the district court stated, "[i]t would be unreasonable to interpret this language as requiring written notice and an opportunity to cure *both* after a single instance of gross negligence or willful misconduct *and* after three occurrences of gross negligence or willful misconduct in any twelve-month period, inasmuch as such an interpretation would render the definition either redundant or absurdly under-inclusive." Further, the district court

24

was correct to consider each of Carmicle's separate access of emails as a separate event. Carmicle was terminated for cause as defined in the Employment Agreement and by incorporation in the Profits Interest Agreements.

## III. CONCLUSION

We affirm the district court. Carmicle's CFAA arguments fail because Brown Jordan suffered loss as defined in the CFAA. As a matter of first impression, we hold a "loss" does not have to stem from an "interruption of service" to be compensable. Carmicle's SCA arguments also fail. He waived his unopened-versus-opened-email argument because he did not fairly present it to the district court. Additionally, Brown Jordan showed Carmicle exceeded his authorization in accessing the emails of other Brown Jordan employees. Lastly, the district court did not err in granting summary judgment on Carmicle's wrongful discharge claim or in determining that Carmicle was terminated for cause as defined by the Employment Agreement.

**AFFIRMED.**